**ORIGINAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

NOV 1 0 2014

U.S. COURT OF
FEDERAL CLAIMS

14-1093C

| | |
|---|---|
| MATSUO ENGINEERING/ | ) |
| CENTERRE CONSTRUCTION | ) |
| A JOINT VENTURE, | ) |
|              Plaintiff, | ) |
| | ) |
|       v. | ) |
| | ) |
| THE UNITED STATES, | ) |
|              Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff, Matsuo Engineering/Centerre Construction a Joint Venture ("MC" or "Plaintiff"), by and through its undersigned counsel, for its Complaint against the United States, alleges as follows:

### NATURE OF ACTION

1.    This case arises out of work performed by Plaintiff for the Defendant, in connection with a federal government construction project known as the "New Custom House Modernization" in Denver, Colorado.

### THE PARTIES

2.    Plaintiff is a joint venture incorporated under the laws of Colorado, comprised of Matsuo Engineering, LLC and Centerre Construction, Inc., doing business in Colorado with its principal place of business at 760 Devinney Ct., Golden, Colorado, 80401.

3.    Centerre Construction, Inc. ("Centerre") is a corporation incorporated under the laws of Colorado, with its principle place of business at 4100 E. Mississippi Avenue, Suite 1225, Denver, Colorado 80246.

4. Matsuo Engineering, LLC, ("Matsuo"), is a limited liability company incorporated under the laws of Colorado, having its principal place of business at 760 Devinney Ct., Golden, Colorado, 80401.

5. Defendant is the United States of America, acting by and through the General Services Administration ("GSA").

## JURISDICTION

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601 *et seq.*

## FACTUAL ALLEGATIONS

**I.     The Solicitation and the GSA-Provided Asbestos Reports**

7. On or about November 4, 2009, Defendant issued Solicitation No. GS-08P-10-JB-C-0007 ("the Solicitation") seeking proposals in connection with Recovery Design-Build Services for the Modernization of the New Custom House in Denver, Colorado ("the Project").

8. The Project involved, *inter alia*, the abatement of asbestos-containing materials ("ACM") from the New Custom House Building ("the Building").

9. The Solicitation's provided that:

> "The U.S. Custom House contains a significant amount of asbestos containing building materials (ACBMs), primarily in the form of flooring (tile and linoleum), mastic, ceilings (tiles and panels), pipe insulation (straight runs and joints), and HVAC system components (duct insulation and connector joint cloth). These ACBMs shall be abated in the areas and systems affected by this modernization project..."

(Solicitation, Design Build Design Intent ("DBDI") § 4.1.1).

10. To further clarify the nature and locations of the referenced ACM at the Project, the GSA included in the Solicitation package three asbestos investigation reports ("the Asbestos Reports"): The first report, which was produced by the US Division of Public Health Service,

was issued in 1994 ("the 1994 Report"); the second report, prepared by the Federal Occupational Health Service, was issued in 2004 ("the 2004 Report"); and the third report, prepared by IHI Environmental ("IHI"), was issued in 2008 ("the 2008 Report").

11.     Within the environmental consulting industry, three types of asbestos investigation reports are provided to owners, depending on the level of detail required or applicability of the information.

12.     The most basic type of report is typically referred to as a "screening" report, and consists of identifying and visually assessing the most prevalent and accessible suspect materials present in an area of interest (which can be the entire building, or only a portion thereof). This type of report also includes limited sampling of those materials, in some cases the sampling of less than the EPA-required minimum number of samples for each suspect material.

13.     On occasion, an owner may request an "area and material-specific" or "focused" report, which consists of inspection (visual and tactile assessment and sampling) of only those accessible suspect materials associated within a given area of renovation or that could be disturbed during planned renovation activities.

14.     An area and material-specific inspection includes collection and analysis of the EPA minimum number of samples of each suspect material within the area of renovation and is typically requested immediately prior to renovation activities. The purpose is to identify for removal any asbestos-containing materials that could be disturbed and result in exposure to employees or other building occupants in the work area.

15.     The third type of asbestos investigation report, the "comprehensive report," is the most extensive type of asbestos inspection report, and consists of inspections (visual and tactile assessments and sampling) of all accessible suspect materials within a building. A

comprehensive asbestos inspection is generally requested just prior to complete building renovations or demolition.

16.     The 1994 Report was an "area and material specific" or "focused" type of report.

17.     Both the 2004 Report and the 2008 Report were comprehensive reports.

18.     Industry standard when preparing a proposal is to use the most current information available.

19.     The 2008 Report identified the date of the re-inspection relating to the report as November 12, 2008. (2008 Report, General Building and Consultant Information Page).

20.     The November 2008 Report was, therefore, completed less than 12 months before MC received the Solicitation documents, and included the most updated information relating to the New Custom House Building.

21.     Accordingly, industry standard would dictate that MC, when assessing the nature, locations, and quantities of ACM on the Project, give the 2008 Report the most consideration.

22.     The Solicitation itself also emphasized the paramount importance of the 2008 report, stating:

> "A report, ***published in 2008***, summarizes the location and nature of these [asbestos] materials within the building, and is included as Appendix C1 to this Document..."

(Solicitation, DBDI § 4.1.1. (Emphasis added)).

23.     The Solicitation further provided that:

> "GSA Asbestos Inspection Report (Dated 11/2008) contains a **comprehensive analysis and record** of known ACBM locations throughout the building, and shall be utilized by the Contractor in the Planning and execution of the project."

(Solicitation, DBDI § 4.1.2. (Emphasis added)).

---

[1] The reference to Appendix C was in error, it should have referenced Appendix D.

24. In effect, the Solicitation explicitly directed offerors to review, and focus upon, the 2008 Report. It characterized the 2008 Report as not only the most recent, but the most extensive, report available.

25. When preparing its proposal for the Project, MC reviewed **all three reports** contained in the bid documents, albeit with a focus on the 2008 Report, in order to determine the nature and extent of ACM in the Building.

26. Plaintiff used the Asbestos Reports, and, in particular, the ACM quantities shown in the comprehensive 2008 Report, to calculate MC's estimated costs for ACM abatement in connection with the Project.

27. Offerors had little to no opportunity to conduct an independent investigation or analysis of the ACM at the Project prior to bidding, as the New Custom House Building was occupied, and the ACM was concealed.

28. Thus, MC acted as a prudent and reasonable contractor, and reasonably relied on the three Asbestos Reports when preparing its proposal for the Project.

29. The Reports failed to accurately describe the locations, nature, or quantities of ACM actually encountered on the Project.

30. Collectively, the Solicitation documents failed to identify pipe sealant or duct sealant on the fiberglass insulation as containing ACM, and significantly underrepresented the quantities of ACM present in the New Custom House Building.

### A. The 1994 Asbestos Report

31. The 1994 Report, Table 1, purported to identify all of the ACM at the Project. (1994 Report, Table 1). This 87-page document went into great detail, providing a room-by-room analysis of all ACM in the Building. (*Id.*)

32.     Although ELL pipe fittings and TEE pipe fittings were identified as materials in which asbestos was confirmed or assumed, "pookie" pipe sealant on fiberglass insulation lines was **not** identified.  Table 1 also failed to identify the duct sealant on the fiberglass round ductwork as an ACM.

33.     Section 10.5 of the 1994 Report, entitled "Existing Conditions," explained that "[p]rior documentation indicated that much of [the pipe insulation] ACM in the project areas had been removed.  This was confirmed by this survey…the majority of the ACM pipe insulation has been replaced with fiberglass insulation with PVC fitting jackets."  (1994 Report, § 10.5, Existing Conditions).

34.     Section 10.5 did not mention "pookie" pipe sealant, indicate that such sealant was placed on the fiberglass, or advise offerors that such insulation lines might contain ACM.  (*See Id.*)

**B.     The 2004 Asbestos Report**

35.     Table 1 of the 2004 Report identified ACM and non-ACM in the Building; it advised offerors that neither the duct sealant nor the pipe sealant contained asbestos:

| SAMPLER NUMBER | ASBESTOS PRESENT? | ----Estimated ASBESTIFORM MINERAL FIBERS | % Composition OTHER FIBROUS CONSTITUENTS | ---------------- Total % Asbestos |
|---|---|---|---|---|
| DS1-11: Sealant: gray, homogeneous, nonfriable, nonfibrous | NO | None Detected | None | 0 |
| PS1-36 Sealant: white, homogeneous, nonfriable, nonfibrous | NO | None Detected | Wollastonite 4 | 0 |
| PS1-75: Sealant: white, homogeneous, nonfriable, nonfibrous | NO | None Detected | Synthetic 4 | 0 |

(2004 Report, Table 1).

36.     Appendix B, Table 1 of the 2004 Report – entitled "Summary of Asbestos Containing Materials" – identified 21 different types of ACM.  It did not mention any pipe sealant or duct sealant.  (2004 Report, Appendix B, Table 1).

37.     In fact, the "Summary of Materials Not Containing Asbestos," found in Appendix B, Table 2 of the 2004 Report, as well as the "Bulk Sample Analysis Results" set forth in Appendix B, Table 3, affirmatively indicated that the PS1-36 and PS1-75 sealants did **not** contain asbestos.  (2004 Report, Appendix B, Tables 2, 3).

38.     Finally, "Table A" of the 2004 Report provided a room-by-room summary of the materials encountered in the New Custom House Building.  This extensive 86-page document did not identify the ACM pipe sealant or ACM duct sealant that was ultimately encountered on the Project.

**C.     The 2008 Asbestos Report**

39.     The 2008 Report was represented as a comprehensive and definitive asbestos investigation study of the New Custom House.

40.     It also advised offerors that ***100***% of the New Custom House building had been inspected for ACM.

41.     The report explained that "[s]ince the primary concern for this investigation was to identify asbestos hazards in the ***entire*** building, IHI or its representatives visually inspected existing conditions within the ***entire*** facility."   (2008 Report, p. 6, Inspection Procedures) (emphasis added).

42.     In addition, section 1 of the 2008 Report stated that:

> "The purpose of this survey was **to identify friable and nonfriable suspect asbestos-containing building materials** (ACBM).  The Scope of this inspection included the following activities:

> • Surveying, identifying, and sampling suspect friable and non-friable ACBM
>
> • Preparing this **comprehensive report** documenting the sampling procedures and results of the ACBM survey.
>
> To accomplish this survey, **all accessible areas of the building** were identified by name and a room number assigned. A summary of identified functional spaces is presented in Table A. Within each space, suspect building materials were identified…"

(2008 Report, p. 5, Introduction and Scope of Work) (emphasis added).

43. The 2008 Report made a number of representations concerning the nature and location(s) of the ACM on the Project.

44. It included detailed drawings and tables specifying, *inter alia*: 1) exact ACM locations; 2) the nature/type of ACM(s) found at each location; 3) the amount/quantity of each ACM found at each location; 4) the condition (friable or non friable) of the ACM(s) found at each location.

45. The 2008 Report identified the ACM either confirmed, or assumed, to be present at the New Custom House Project. It concluded that, of the 102 suspect materials, only 28 were confirmed as containing, or might reasonably be anticipated to contain, ACM. (2008 Report, pp. 8-9).

46. This list of 28 materials did not include "pookie" pipe sealant or duct sealant.

47. Table B (pp. 24-137) set forth IHI's room-by-room summary concerning suspected and confirmed ACM on the Project site. (2008 Report, Table B, pp. 24-137).

48. Table B provided a comprehensive listing of all ACM an offeror could expect to encounter on the Project. It indicated that the fiberglass insulated lines at the New Custom House did *not* contain ACM.

8

49.     Appendix B, Table 2, of the 2008 Report provided a "Summary of Confirmed Asbestos-Containing Materials and Recommended Response Actions." (2008 Report, Appendix B, Table 1). It identified 23 different materials at the Project site that contained, or were assumed to contain, ACM. This list did not include "pookie" pipe sealant or duct sealant.

50.     There was not a single instance in the 2008 Report where fiberglass insulation was identified as containing ACM. (In fact, not one of the three Asbestos Reports referenced "pookie" pipe sealant on fiberglass insulation lines, or advised that such sealant might contain asbestos.)

51.     Rather, the 2008 Report advised offerors that the fiberglass pipe insulation (including pipe sealant) and fiberglass duct insulation did **not** contain ACM. The 2004 and 2008 Reports both specifically advised offerors that the fiberglass pipe insulation was "non-detect" for ACM.

52.     Appendix B, Table 2 of the 2008 Report provided a "Summary of Materials **Confirmed Not to Contain Asbestos**" (2008 Report, Appendix B, Table 2) (emphasis added).

53.     In relevant part, it provided:

| Material Description | Material Number and Additional Comments | Lab Results |
|---|---|---|
| Straight Pipe Insulation | Fiberglass | ND* |
| Pipe Joint Insulation | T2. Muddled Fittings on fiberglass insulated lines | ND* |
| Duct Insulation | T8. 1 Duct insulation foil backed fiberglass (DI1) | ND* |
| Duct Insulation | T8. 3 Duct insulation (DI3) | ND* |
| Duct Insulation | T8. 4 Duct insulation Liner | ND* |

*ND – Asbestos Not Detected
(*Id.*)

54. Appendix B, Table 3 of the 2008 Report provided Bulk Sample Analysis results and Assumed materials. In relevant part, in provided:

| Sample No. | Material Description | Material Number and Additional Comments | Sample Location (Room Number) | Lab Results |
|---|---|---|---|---|
| PC1-163 | Straight Pipe Insulation | Fiberglass | B1087 | ND* |
| DS1-11 | Caulking | M8.1 Gray duct sealant (DS1) | 2046 | ND* |
| DS2-12 | Caulking | M8.2 Black duct sealant (Ds2) | 2046 | ND* |
| PS1-130 | Caulking | M8.3 White pipe sealant (PS1) | 5019 | ND* |
| PS1-75 | Caulking | M8.3 White pipe sealant (PS1) | 1054 | ND* |
| PSI-36 | Caulking | M8.3 White pipe sealant (PS1) | 2076 | ND* |
| DS3-36 | Caulking | M8.4 Gray duct sealant (DS3) | 1050 | ND* |
| DS4-152 | Caulking | M8.8 Duct sealant (DS4) | B1075 | ND* |
| T2.3A | Pipe Joint Insulation | T2.3 Mudded fittings on fiberglass insulated lines | B1018 | ND* |
| T2.3B, C | Pipe Joint Insulation | T2.3 Mudded fittings on fiberglass insulated lines | B1052 | ND* ND* |
| T2.4A, B, C | Pipe Joint Insulation | T2.4 Pipe fitting insulation on large ducts | 1073 | ND* ND* ND* |
| DI1-161 | Duct Insulation | T8.1 Duct insulation foil backed fiberglass (DI1) | B1135 | ND* |
| DI3-171 | Duct Insulation | T8.3 Duct Insulation (DI3) | B1079 | ND* |
| T8.4A | Duct Insulation | T8.4 Air Duct Liner ** | S1013 | ND* |

*ND – Asbestos Not Detected
(2008 Report, Appendix B, Table 3).

55. Thus, Appendix B, Tables 2 and 3 clearly informed offerors that the fiberglass pipe insulation as well as the fiberglass duct insulation were **free of ACM**. (*Id.*)

56. In addition to Appendix B, the Executive Summary section of the 2008 Report stated that the material sampled on the fiberglass insulation lines **did not contain asbestos**. (2008 Report, Executive Summary, p. 1) (emphasis added).

57. The 2008 Report also referenced prior renovations and asbestos abatement activities within the New Custom House Building. (2008 Report, Executive Summary, p. 1).

58. Specifically, it advised offerors that the New Custom House Building had undergone significant renovations in the mid-1960s. The 2008 Report stated that during the 1960s renovation, a majority of the original heating system piping insulation was removed. It went on to describe the removal, during the 1960s renovation, of the domestic piping insulation.

59. The 2008 Report did not mention that the *replacement* heating system piping insulation – which was installed after the 1960s renovation and removal – was installed using ACM pipe and duct sealant. To the contrary, it implied that the removal of these materials in the 1960s eliminated all ACM located in the heating system piping insulation.

60. The 2008 Report also referenced a 1988 abatement project at the New Custom House which removed from select areas the straight run pipe insulation, debris, and floor tile.

61. Collectively, the Asbestos Reports provided MC with affirmative representations concerning the locations and nature of the ACM at the Project, upon which MC relied when preparing its proposal.

62. Unfortunately, as set forth in detail below, the Asbestos Reports misrepresented the conditions in the New Custom House Building.

## II. Contract and Performance

63. MC submitted its final revised proposal for the Project on or about March 8, 2010.

64. On or about March 17, 2010, MC entered into a written contract (Contractor No. GS-08P-10-JB-C-0007; the "Contract") with the GSA to perform the Project.

65. MC subsequently engaged abatement consultant Walsh Environmental Scientists and Engineers, LLC ("Walsh") to assist with performance of the Project.

66.    On or about August 24, 2011, MC engaged Hudspeth & Associates, Inc. ("Hudspeth" or "the Subcontractor") to perform asbestos abatement, demolition, and other related work.

67.    The scope of work for the Contract involved abatement in the basement, and 1st through 4th floors of the New Custom House Building.

68.    MC, Hudspeth and Walsh planned to start on the 4th floor of the building and work sequentially down to the basement. They planned to complete all work on one floor before moving on to the next floor.

69.    The work started in or around July of 2011. From that point until approximately November of 2012, MC began to experience unanticipated ACM.

70.    More specifically, there were certain areas within the upper floors that appeared to contain more ACM than the quantities indicated in the Solicitation documents, including, but not limited to, the Asbestos Reports.

71.    At first, the discrepancies seemed minor, but by December 2012 it was clear that there were **significant** quantities of additional, unanticipated quantities of ACM present in the New Custom Building, and, further, that ACM was present in additional, unanticipated locations.

72.    The conditions encountered on site were, therefore, materially different than those represented in the Solicitation documents including, but not limited to, the Asbestos Reports.

73.    For example, "pookie" sealant was found on five hydronic main lines; this was not indicated in the Solicitation documents.

74.    In addition, asbestos-containing round duct sealant was found brushed onto the seams of the 10" foil insulation covering metal HVAC ducts.

75. Unanticipated asbestos-containing pipe insulation was also discovered throughout the Building.

76. Much of the unforeseen ACM was discovered in the pipe and duct sealant that was installed in the 1960s.

77. None of this material was identified as ACM in the Asbestos Reports.

78. Moreover, some of the pipes and ducts installed as part of the renovation work of the 1960s were installed in plaster soffits or behind plaster chases. The presence of this ACM was, therefore, not apparent until MC removed the plaster soffits and plaster chases during demolition.

79. MC provided GSA timely notice of the differing site conditions concerning the unanticipated ACM and requested an equitable adjustment of the Contract amount in connection with the same.

80. MC followed up several times, providing GSA with additional notice of these differing site conditions encountered at the Project.

81. The unanticipated ACM was also discussed in meetings with GSA.

82. Ultimately, on or about December 11, 2012, MC sent a notice letter regarding the additional, unanticipated ACM discovered at the Project. It again requested an equitable adjustment of the Contract amount.

83. The GSA did not timely respond to MC's December 11, 2012 letter.

84. Meanwhile, GSA directed MC to abate **all** ACM at the Project site.

85. Between December 11, 2012 and March 14, 2013, MC continued to encounter additional ACM that was not identified in the Solicitation documents. These conditions were repeatedly brought to the attention of the Contracting Officer.

86. On or about March 14, 2013, MC revised its December 11, 2012 letter to reflect the additional quantities and locations of unanticipated ACM encountered between December 11, 2012 and March 14, 2013.

87. On or about April 1, 2013, the GSA issued a letter to MC, in which it acknowledged receipt of MC's December 11, 2012 letter; no mention was made of the March 14, 2014 update thereto.

88. In the April 1, 2013 letter, GSA refused to equitably adjust the Contract to account for the differing site conditions encountered by MC.

89. On May 6, 2013, the Contracting Officer specifically advised MC that it was "contractually obligated to remove all ACM and in accordance with FAR § 52.233-1 [MC had] a duty to proceed."

90. Then, by letter dated June 18, 2013, the GSA responded to MC's March 14, 2013 letter.

91. In that letter, the GSA indicated that it would not be conducting the inspection of alleged differing site conditions required pursuant to 48 C.F.R. § 52.236-2 because that inspection would prove too "difficult."

92. The GSA's refusal to investigate the differing site conditions was in contravention of applicable law and the Contract.

93. Moreover, in the June 18, 2013 letter, GSA threatened to terminate MC for default if MC did not perform the abatement of all ACM, including the additional, unanticipated ACM that was not identified in the Solicitation documents.

94. Accordingly, MC had no choice but to continue with the abatement of the unanticipated ACM, even though its presence was not identified in the Solicitation documents,

was not, therefore, considered when MC prepared its' proposal, and was not within the scope of work required under the Contract.

95.     By way of summary, the differences between the locations, types, and quantities of ACM noticed in the Solicitation documents and the conditions actually encountered appears to be as follows:

| Basement | 1994 Report | 2004 Report | 2008 Report | Actual |
|---|---|---|---|---|
| Pipe Insulation | 1,731 LF | 538 LF | 2,437 LF | 3,737 LF |
| Pipe Fitting | 464 EA | 190 LF | 381 EA | 824 EA |
| Pipe Sealant (Pookie) | 0 LF | 0 LF | 0 LF | 2,993 LF |
| Duct Sealant | 60 LF | 0 LF | 0 LF | 1,128 LF |

| First Floor | 1994 Report | 2004 Report | 2008 Report | Actual |
|---|---|---|---|---|
| Pipe Insulation | 37 LF | 4 LF | 478 LF | 3,163 LF |
| Pipe Fitting | 240 EA | 3 EA | 101 EA | 619 EA |
| Pipe Sealant (Pookie) | 0 LF | 0 LF | 0 LF | 8,039 LF |
| Duct Sealant | 0 LF | 0 LF | 0 LF | 3,346 LF |

| Second Floor | 1994 Report | 2004 Report | 2008 Report | Actual |
|---|---|---|---|---|
| Pipe Insulation | 150 LF | 4 LF | 361 LF | 1,797 LF |
| Pipe Fitting | 113 EA | 2 EA | 64 EA | 403 EA |
| Pipe Sealant (Pookie) | 0 LF | 0 LF | 0 LF | 5,266 LF |
| Duct Sealant | 0 LF | 0 LF | 0 LF | 3,346 LF |

| Third Floor | 1994 Report | 2004 Report | 2008 Report | Actual |
|---|---|---|---|---|
| Pipe Insulation | 150 | 0 | 360 | 1,607 |
| Pipe Fitting | 293 | 106 | 78 | 328 |
| Pipe Sealant (Pookie) | 0 | 0 | 0 | 0 |
| Duct Sealant | 0 | 0 | 0 | 1,288 |

| Fourth Floor | 1994 Report | 2004 Report | 2008 Report | Actual |
|---|---|---|---|---|
| Pipe Insulation | 396 | 0 | 2,480 | 3,457 |
| Pipe Fitting | 469 | 118 | 292 | 430 |
| Pipe Sealant (Pookie) | 0 | 0 | 0 | 290 |
| Duct Sealant | 0 | 0 | 0 | 2,328[2] |

96.     MC ultimately abated approximately 42,265 total units of ACM from the Building, only 7,032 of which was identified in the Solicitation documents.

97.     The conditions encountered at the Project involved approximately 501% more ACM pipe insulation, pipe fittings, pipe sealant, and duct sealant than MC reasonably anticipated based on the Solicitation and Asbestos Reports.

---

[2] Duct Sealant was abated from the 4th floor but the Abatement Contractor did not document the quantities so MC averaged the quantities from the other floors for the 4th floor duct sealant.

98.   The additional, unanticipated ACM work that GSA required MC to perform caused significant delays to the Project.

99.   This additional, unanticipated ACM work also caused MC to incur unanticipated costs in excess of $3,423,911.00.

100.   Despite repeated requests for compensation, GSA has steadfastly refused to equitably adjust the Contract or otherwise fully compensate MC for the substantial costs incurred with all of the unanticipated ACM work.

## III.   REA and Claim

101.   MC filed a request for equitable adjustment ("REA") on or about June 28, 2013.

102.   On or about July 24, 2013, GSA responded, denying MC's REA in its entirety.

103.   On or about February 12, 2014, MC filed a certified claim ("Claim") pursuant to the FAR Subpart 33.2, the FAR Disputes Clause contained in the Contract (48 C.F.R. § 52.233-1) and the Contract Disputes Act, explicitly requesting a Contracting Officer's Final Decision.

104.   On April 2, 2014, the GSA acknowledged receipt of the Claim and indicated that it would issue a response no later than June 12, 2014. It did not request any additional information from MC.

105.   On May 30, 2014, the GSA issued another letter, indicating that it would not have a decision by June 12, and stating that it anticipated having a final decision prepared on or before August 11, 2014. Again, there was no request for additional information from MC. The letter indicated that if the GSA determined that more time was needed, it would notify MC of that fact **prior** to August 11, 2014.

106. On August 11, 2014, the day upon which the GSA had promised its response, it sent a third letter, indicating that it would now issue a response no later than September 15, 2014. The GSA did not request any additional information from MC.

107. On September 12, 2014, the GSA again moved the deadline back, this time to October 10, 2014. No additional information was requested.

108. On October 9, 2014, the GSA sent a letter indicating that it would have its final decision prepared on or before October 31, 2014. Again, GSA did not request any additional information from MC.

109. Finally, on October 30, 2014, GSA issued a letter, pushing its response deadline from October 31, 2014 to November 10, 2014. No additional information was requested.

110. Pursuant to 41 U.S.C. § 7103(f)(2) and (3), GSA was required to provide a final response within a reasonable time. It has failed to do so.

111. Not once has GSA provided any sort of explanation as to why more time was/is required.

112. Given that GSA has not, on any of the five (5) occasions it extended its response deadline, requested additional information, the reason for the extensions is clearly **not** that GSA needs more information from MC to complete its analysis.

113. The GSA's repeated extensions of the deadline have far exceeded a "reasonable" time period in which to provide a Contracting Officer's Final Decision. It has now been over eight (8) months since the submission of the Claim.

114. Pursuant to 48 C.F.R. § 33.211(g), the GSA's failure to issue a Contracting Officer's Final Decision is a deemed denial of the Claim.

115. As such, MC hereby appeals the deemed denial of its Claim to this Court.

## COUNT I
## TYPE I DIFFERING SITE CONDITIONS

116. MC incorporates the foregoing paragraphs as if set forth at length herein.

117. As set forth above, the Solicitation and Contract documents, including, but not limited to, the Asbestos Reports, made affirmative representations about the nature, location, and quantities of ACM at the Project.

118. MC acted as a reasonably prudent contractor in interpreting the Solicitation and Contract documents.

119. MC reasonably relied on the Solicitation and Contract documents, including, but not limited to, the Asbestos Reports and the representations made therein regarding the nature, location and quantities of ACM at the Project.

120. As such, MC's proposal was based upon the scope of work described in the Solicitation documents, and, in particular, upon the specific scope of work described with regard to the abatement of certain ACM, the precise nature, location and quantities of which were described in the Asbestos Reports.

121. Throughout performance of the Project, MC encountered ACM that it had not anticipated, and should not reasonably have anticipated, based on the Solicitation documents, including, but not limited to, the Asbestos Reports.

122. Indeed, the conditions actually encountered at the Project site were materially different than those represented in the Solicitation.

123. The actual conditions encountered at the Project site were reasonably unforeseeable by MC.

124. The actual site conditions – which differed materially both from conditions usually encountered on similar projects and from the conditions affirmatively represented in the Contract documents – negatively impacted Project performance.

125. The additional ACM work caused MC to incur unanticipated costs, and also caused delays to the Project.

126. MC timely notified the GSA of the unforeseen and differing site conditions relating to unanticipated ACM.

127. Despite several requests for compensation, GSA has refused to equitably adjust the Contract price or otherwise sufficiently compensate MC for the unanticipated abatement work.

WHEREFORE, Plaintiff respectfully requests that the Court find that MC is entitled to an equitable adjustment in the Contract amount and an appropriate extension of the Contract time of performance, and requests judgment in the amount of $3,423,911.00 against Defendant, plus interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

**COUNT II**
**CHANGES**

128. MC incorporates the foregoing paragraphs as if set forth at length herein.

129. As set forth above, the Solicitation and Contract documents, including, but not limited to, the Asbestos Reports, made affirmative representations about the nature, location, and quantities of ACM at the Project site.

130. MC's proposal was based upon the scope of work described in the Solicitation and Contract documents, and, in particular, upon the specific scope of work described with

regard to the abatement of ACM, the precise nature, location and quantities of which were described in the Asbestos Reports.

131.    Similarly, the scope of ACM abatement work required under the Contract, as awarded, was based upon the nature, location and quantities of ACM present at the site, as it was described in the Solicitation and Contract documents, including, but not limited to, the Asbestos Reports.

132.    The actual site conditions differed materially both from conditions usually encountered on similar projects and from the conditions affirmatively represented in the Contract documents.

133.    Throughout performance of the Project, MC encountered ACM that it had not anticipated, and should not reasonably have anticipated, based on the Solicitation and Contract documents, including, but not limited to, the Asbestos Reports.

134.    GSA explicitly directed MC to perform all abatement work required, whether or not identified in the Solicitation or Contract or included in the Contract's scope of work.

135.    The GSA's directives constituted an express, or, in the alternative, constructive, change to the Contract.

136.    The additional out-of-scope ACM abatement work GSA directed MC to perform caused MC to incur unanticipated costs, and also caused delays to the Project.

137.    Despite several requests for compensation, GSA refused to equitably adjust the Contract price or otherwise sufficiently compensate MC for the unanticipated abatement work.

WHEREFORE, Plaintiff respectfully requests that the Court find that MC is entitled to an equitable adjustment in the Contract amount and an appropriate extension of the Contract time of performance, and requests judgment in the amount of $3,423,911.00 against Defendant, plus

interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

## COUNT III
## DISPUTES

138.    MC incorporates the foregoing paragraphs as if set forth at length herein.

139.    On February 12, 2014, MC properly submitted a Claim pursuant to FAR Subpart 33.2, the FAR Disputes Clause contained in the Contract and the CDA, specifically requesting a Contracting Officer's Final Decision.

140.    To date, GSA has failed to issue a Contracting Officer's Final Decision.

141.    Instead, the GSA has, on five (5) separate occasions, extended its own response deadline.

142.    GSA has never requested additional information from MC; the reason for the GSA's extensions is clearly **not** that GSA needs more information from MC to complete its analysis.

143.    Not once has GSA provided any sort of explanation as to why more time was/is required.

144.    The GSA's repeated extensions of the deadline have far exceeded a "reasonable" time period in which to provide a Contracting Officer's Final Decision.

145.    It has now been over eight (8) months since the submission of the Claim.

146.    Pursuant to 48 C.F.R. 33.211(g), the GSA's failure to issue a Contracting Officer's Final Decision is a deemed denial of the Claim.

147.    As such, MC hereby appeals the deemed denial of its Claim to this Court.

WHEREFORE, Plaintiff respectfully requests that this Court render judgment in its favor, and against Defendant, in the amount of $3,423,911.00 plus interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

**COUNT IV**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

148.     MC incorporates the foregoing paragraphs as if set forth at length herein.

149.     Throughout Contract performance, the GSA's administration of the Contract was marked by interference and hindrances, including but not limited to: failure to promptly investigate conditions which MC identified as differing site conditions despite receiving notice of same from MC; failure to recognize and compensate MC for differing site conditions; directing MC to perform certain work as part of a remedial effort to ameliorate differing site conditions despite MC's disagreement, and numerous other active interferences with MC's efforts to perform the work required by the Contract.

150.     At a minimum, the GSA's actions and inactions in administering the Contract and related conduct were marked by subterfuges and evasions, and caused delay and hindrance to MC's Contract performance and MC's efforts to prosecute its claims under the Contract.

151.     The GSA's actions and inactions were inconsistent with the Contract's purpose, and deprived MC of the contemplated value of that Contract.

152.     The GSA's misconduct destroyed the reasonable expectations of MC regarding the fruits of the Contract.

153.     The GSA's actions and inactions, therefore, constituted a breach of the duty of good faith and fair dealing.

154. As a direct and proximate result of the GSA's breach of the duty of good faith and fair dealing, MC incurred costs far in excess of the amount MC reasonably anticipated to perform the Contract.

155. Through its misconduct in administering the Contract, the GSA proximately caused MC to suffer damages in excess of $3,423,911.00.

WHEREFORE, Plaintiff respectfully requests that this Court render judgment in its favor, and against Defendant, in the amount of $3,423,911.00 plus interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: November 7, 2014

Edward T. DeLisle, Esquire
Cohen Seglias Pallas Greenhall
& Furman PC
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA 19103
Tel: 215-564-1700
Fax: 267-238-4456
e-mail: edelisle@cohenseglias.com

*Attorney for Plaintiff*
*Matsuo Engineering/*
*Centerre Construction*
*a Joint Venture*

Of Counsel:
Maria L. Panichelli, Esquire
Cohen Seglias Pallas Greenhall & Furman PC